SAN JUAN RACING CORPORATION, INC., Plaintiff and Appellee, *v.* MUNICIPALITY OF CAROLINA, Defendant and Appellant.

No. R-64-82.     Decided March 23, 1965.

*J. B. Fernández Badillo, Solicitor General, Rodolfo Cruz Contreras, Acting Solicitor General, María Luisa B. Fuster,* and *Américo Serra, Assistant Solicitors General,* for appellant. *Córdova & Cebollero* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

San Juan Racing Association, appellee herein, filed a complaint in the San Juan Part of the Superior Court against the Municipality of Carolina, challenging the license tax in the sum of $53,350 levied by that Municipality for the fiscal year 1962–63, based on appellee's volume of business during 1961 which defendant Municipality determined to be $27,000,000. Appellee alleged that its volume of business for the calendar year 1961, from all sources and in all municipalities of Puerto Rico, was $7,357,457.65, and that of this amount only $3,729,703.15 was attributable to the Municipality of Carolina and the remainder corresponding to wagers placed in other municipalities on races held at taxpayer's racetrack. The appellee Association paid under protest $13,375, corresponding to the first quarter, and applied for refund. The San Juan Part of the Superior Court rendered on the merits the following:

"JUDGMENT

"The San Juan Racing Association, Inc., reported to the Municipality of Carolina a volume of business for 1961 in the sum of $7,357,457.65.

"The Municipality of Carolina determined a volume of business of $27,000,000 for that year, and levied a municipal license tax based on that volume of business.

"At the hearing of the case the parties stipulated the following facts:

"1. That plaintiff's volume of business for 1961 was $27,127,733.08, which sum represents plaintiff's share as well as the bettors' and the Commonwealth's share.

"2. Of these $27,127,733.08, the amount of $7,357,457.65 corresponded to plaintiff as its share (percent) of the business throughout the Island of Puerto Rico.

"3. Of the $7,357,457.65, the sum of $3,252,090.87 corresponds to business done in the Municipality of Carolina.

"4. This case involves the municipal license tax for 1962–63.

"The question at issue between the parties is whether the levying of the license tax should be on the basis of:

"(a) $27,127,733.08, the total volume of business in all of plaintiff's transactions, including the amounts paid to the bettors and the Commonwealth's share.

"(b) $7,357,457.65 which represents plaintiff's share in the volume of business throughout the Island of Puerto Rico in the sum of $27,127,733.08.

"(c) $3,252,090.87, which represents plaintiff's share in the volume of business done only within the Municipality of Carolina.

"The Municipality of Carolina may levy and collect municipal license taxes as of July 1, 1962, on the basis of the volume of business done in Carolina only and not on the volume of business within the entire Island of Puerto Rico. (Act No. 93 of June 25, 1962, Sess. Laws, p. 243.)

"The race-track business is subject to a license tax (21 L.P.R.A. § 622, Group B) on the basis of the volume of business (§ 623), and by volume of business is meant the gross receipts realized in any municipality from its transactions, its gains or profits not alone to be considered, the amount of receipts from any business transacted or *service rendered* in accordance with the nature of the business or industry (§ 624).

"The levying of the tax on plaintiff shall be based on the $3,252,090.87 corresponding to it on business transacted in

the Municipality of Carolina as of July 1, 1962, is proper. The tax may not be levied on the sum which it pays to bettors, nor on the amount paid to the Commonwealth. Plaintiff is rather a depositary and who renders a service, its volume of business being therefore the total amount received by way of compensation or remuneration for its activities or efforts. (Zerbe Penn Advertising Co., Inc. v. Berrocal, judgment of November 30, 1962, review 390, Supreme Court of Puerto Rico.)

"The license tax should therefore be based on the income of $3,252,090.87, liquidated in accordance with 21 L.P.R.A. § 623, and reimbursement of the excess tax paid amounting to $13,375 together with interest at 6 percent as of July 2, 1962, on the sum to be refunded is granted."

The Municipality of Carolina, represented by the Solicitor General, took this appeal from the foregoing judgment. It assigned as errors: (1) the determination of the license tax based on $3,252,090.87, corresponding to the taxpayer's income from the volume of business transacted in the Municipality of Carolina, and (2) in determining that no license tax could be levied on all the transactions carried out by plaintiff-appellee, including the amounts paid to the bettors and the Commonwealth by the taxpayer.

The "Municipal License Tax Act"—No. 26 of March 28, 1914, as amended, 21 L.P.R.A. §§ 621–39 (1961 ed.)— authorizes the municipal assemblies to levy a license tax on any form whatsoever of commercial or industrial organization engaged in any of the businesses or industries mentioned in the Act, on the basis of the *volume of business* transacted during the calendar year immediately preceding. Section 4 of the Act, as amended by Act No. 93 of June 25, 1962, defines *volume of business* as "the gross receipts, from the business or industry within the municipality where the headquarters thereof carry out its operations, or the gross receipts obtained from the headquarters of the business where the latter may keep sale offices, warehouses or any type of industrial or commercial organization to carry out business

in its name . . . and, in general, the amount of receipts from any business transacted or service rendered in accordance with the nature of the business or industry." The problem presented here is fundamentally the determination of what constitutes "gross receipts from a business or industry" in a business such as that in which appellee Association is engaged. Specifically, as the latter points out in its brief, the problem is to determine whether the total sum wagered in the *pool*, the mutuel, and daily double, or only that part thereof as by provision of law corresponds to the Association, should be included in appellee's gross receipts subject to municipal license tax.

The Racing Act of Puerto Rico, No. 149 of July 22, 1960, provides as follows:

"Deductions in Bets.—The natural or artificial persons operating race tracks shall make the following deductions from the bets: twenty-five (25) per cent of the total sum wagered at the *bancas,* after deducting the money bet on the winning horses in the respective races, and thirty (30) per cent of the gross total wagers laid on the daily double combinations (*quiniela*); and the pool.

"The gross total derived by reason of said deductions, except that from the *bancas,* shall be distributed in the following manner: ninety-five (95) per cent for the natural or artificial person operating the race track and five (5) per cent for the General Fund of the Commonwealth Treasury. The deduction from the *bancas* shall go to the race track.

"In the pay-offs of the bets there shall not be paid to the winners 1, 2, 3, or 4 cents or any fraction of a cent, which cents or fractions thereof shall be retained by the corporation owning the race track and paid over weekly to the Administrator, who shall cover same into the General Fund of the Commonwealth Treasury.

"The right to collect the prizes shall expire after six (6) months, counting from the day on which they are won, and the money unclaimed for this reason shall be forthwith transmitted by the corporation owning the race track to the Secre-

tary of the Treasury, who shall cover same into the General Fund of the Commonwealth Treasury."[1]

The business in which appellee Association is engaged presents, for the purposes of the imposition of license tax, special characteristics due to the duality of its operations. In a sense, it bears certain analogy to the situation in the cases of *Zerbe Penn Advertising Co.* v. *Gov't of the Capital,*

---

[1] The Horse Racing Regulations of February 23, 1962, 15 R.&R.P.R. § 186–1, defines "mutuel" as the place designated for betting on each individual race and the betting system known by that name; "daily double" (*quiniela*) as a bet to determine the winner of two races specifically designated for such a bet; and "pool" as a system of betting consisting of selecting the greatest number of winning horses and the greatest number of winning horses minus one on a race day, and which appear in the single combination pool tickets and in multiple combination pool tickets duly received, stamped and registered by the Association—§ 186–611. The sales price of a multiple combination pool ticket to the public shall not be in excess of 10 cents each, and any tax imposed by law shall be added thereto; and the sales price of a single combination pool ticket shall not exceed seven cents plus any tax imposed by law—§§ 186–633, 634.

Section 186–640 provides that the gross total of the pool shall consist of the bets made in the agencies and at the racetrack after *deducting the agents' commission*; and that the Association shall deduct 30 percent of the gross total of the pool retaining 95 percent of the amount deducted for itself, and shall remit five percent to the Secretary of the Treasury with a copy of the settlement to the Administrator. (It should be observed that § 12 of the Horse Racing Act fixes 30 percent of the gross total *wagers*, which apparently is not the same, at least for the purposes of the license-tax problem involved here.) Mutuel tickets shall be issued within the premises of the racetrack—§ 186–650. Whenever a horse is withdrawn after the betting has started, all money bet on that horse shall be deducted and returned to the bettors—§ 186–660. Whenever one of the horses forming part of an entry is withdrawn, the money shall also be returned— § 186–661. When the field is constituted by only two horses and one of them is withdrawn, the money shall also be returned—§ 186–662. Whenever the field is constituted by more than two horses and two or more horses are withdrawn, the money shall likewise be returned—§ 186–663. Whenever in any of above situations the starter decides that a horse has been prevented from running because the door of the cage failed to open, the money shall likewise be returned—§ 186–664. If none of the horses finishes the race, all the money wagered in mutuel tickets shall be returned to the bettors— § 186–678; whenever a race is called off by the stewards, the money shall also be returned—§ 186–679. Section 186–684 provides that in paying out the pool, mutuels and daily double, 1, 2, 3 and 4 cents, or fractions of a cent shall not be included, and that these cents shall be retained by the

86 P.R.R. 586 (1962), and *Cía. Azucarera del Toa* v. *Municipality of Toa Baja*, judgment of June 30, 1958. In other aspects, the business of appellee Association is different from that in those cases. In *Zerbe* the advertising agencies were engaged in the advertising and promotion of goods and effects through different publicity media. The trial court considered as "volume of business" of such advertising agencies the total amount received by them from their clients or customers, out of which the agencies had to pay the expenses of the advertising media, and only 15 percent corresponded to them for the services rendered. We did not agree with the trial court that the volume of business of such agencies, for purposes of the license-tax assessment, was constituted by the total amounts received from their customers. We stated as follows:

"The decision of this appeal therefore depends on the determination of what is meant by appellants' 'volume of business.' Section 4 of the License Tax Act does not contain a specific reference to publishing agencies, such as in the case of banks, business stores and establishments, land transportation

Association and remitted by the Administrator to the Secretary of the Treasury.

According to § 186–687, the money bet on the winning horse shall be deducted from the total amount wagered in the win mutuel; the 25 percent authorized by the Racing Act for the Association shall be deducted from the remainder; the 10 percent excise tax shall be deducted from the balance; and the remainder shall be the net amount to be distributed among the bettors. A similar distribution shall be made in place mutuels— § 186–688.

Regarding daily double wagers (*quiniela*), § 186–707 provides that the sale price for each daily double form shall not exceed 10 cents when obtained from a racetrack agent, and the Administrator shall determine the price which the Association may charge to the agent for such form— § 186–708. According to § 186–722, the 30 percent fixed by law shall be deducted from the total amount wagered, 10 percent from the remainder for excise taxes, and the balance shall be divided among the winning tickets.

Lastly, all the pool, daily double, and mutuel prizes shall expire after six months and shall be covered into the funds of the Treasury of Puerto Rico—§§ 186–620, 666, 724.

enterprises, telephone and electric services, and the commission agents or brokers. We should therefore abide by the general definition, as it stood during the tax years involved herein, which reads: 'volume of business shall be understood to be the gross receipts in any municipality of the business or industry, from its business transactions in Puerto Rico, its gain or profits not alone to be considered,' and adds 'the amount of receipts from any business transacted or *service rendered* in accordance with the nature of the business or industry.'

"In our opinion, these provisions mean that the amount of the tax is levied on the gross receipts and not on the net receipts —hence the reference that the volume of business is determined irrespective of the gain or profits—and to distinguish—by the nature of the business or industry—between the amount of receipts when they are derived from the operation of a business or from a service rendered. We need not elaborate further to conclude that an advertising agency is engaged essentially in the rendering of services and that the operations which it carries out are those connected with the rendering of these services, its volume of business being therefore the total amount received by way of compensation or remuneration for its activities or efforts."

After referring to *Cía. Azucarera del Toa* v. *Municipality of Toa Baja*, we said further in *Zerbe*:

". . . With greater reason, in the case of publishing agencies we cannot consider as part of their volume of business the amounts representing the advertising cost, which cost forms part properly of the volume of business of the publicity medium. That is why the purported comparison with the commission agent who sells goods on commission is wholly untenable. The advertising agency renders services; it does not sell goods. In any event, according to the rule of construction stated in *Cervecería India* v. *Municipality*, 77 P.R.R. 91 (1954), the scope of the taxing power should be restrictively construed."

In *Cía. Azucarera del Toa*, *supra*, it was necessary to determine whether for the purposes of the license tax the volume of business of Central Constancia for the year 1953–54 was $4,342,414.77, the value of all the sugar and molasses produced by that central, or, on the contrary, whether its

volume of business was only $1,598,389.31, the value of the sugar and molasses produced which was the central's share under the Sugar Act then in force, the remainder of the produced sugar and molasses belonged to the colonos. In that case the central did not grind its own cane. In passing upon the question, the trial court stated in part as follows:

"Section 4 defines that for the purposes of that Act, volume of business means the *gross receipts* in any municipality of the business or industry from the transactions carried out in Puerto Rico, its gains or profits not alone to be considered . . . and, in general, *the amount* of receipts from any business transacted or service rendered, in accordance with the nature of the business or industry.

"Sugar centrals operate as public-service entities under strict regulations and a tariff system contained in Act No. 426 of May 13, 1951, known as the 'Sugar Act of Puerto Rico.' Section 3 of this Act provides that no sugar central shall refuse to grind the cane of a colono, or of his successors or successors in interest, who may have been a colono of said central . . . and it shall likewise be bound to grind the cane of the new colonos, unless the Sugar Board exempts it from such obligation after it is shown that the central lacks sufficient capacity to assume the grinding of the cane from such colonos.

"On certain occasions the central grinds, in addition to the cane of the colonos, the cane which it produces. In the case at bar plaintiff did not harvest cane and merely rendered grinding service to third persons. If plaintiff were engaged in rendering a public service which by law it is bound to render indiscriminately, such as the grinding of cane and its processing into commercial sugar and molasses, we have no doubt at all that plaintiff's *business or industry* was the rendering of a service. The corollary which follows is that plaintiff's volume of business is constituted by the *gross* receipts of what it receives or obtains for the service rendered. It operates its business or industry in exchange for that gross receipts or compensation and in order to obtain the same. In this sense plaintiff, as renderer of a public service, is in a position similar to that of the transportation, telephone, or electric services mentioned in § 4 of the Municipal License Tax Act, in which case it is provided that by volume

of business is meant the amount of the receipts from such services, and it comes likewise within the general provision at the end of § 4 to the effect that volume of business shall mean the amount of *receipts* from any . . . service rendered.

"If the sugar industry would operate by law under a more simple tariff system, as for example, that the central be paid for grinding each hundredweight or ton of cane delivered in the same manner as other public services are paid, the central would only have a gross receipt in cash as a result of its operations. No one would question that the amount of such gross receipts would represent its volume of business. However, because of the nature of this industry, the manner provided by law for the collection for the services rendered by the central is even more complicated than the payment in cash per unit of cane ground. In converting the cane into sugar and molasses, the central may retain for itself, in payment for its service, a fixed percentage of the sugar and molasses produced, and the remainder corresponds to the colono. Sometimes the colono is given his share in kind, sugar and molasses, as in the case with the Land Authority in the case at bar, and other times the central, under regulation of law, retains the sugar and the molasses in order to sell them in the market as agent for the colono and pays to the latter his share in cash. Whichever system is used, it must always be concluded that the central receives in exchange for its services only the cash value of the sugar and molasses which under the legal tariff is owing to the central, as a result of its industrial process, since it never acquires ownership title to the colono's shares. The value of the colonos' share does not constitute part of the central's volume of business, according to the lawmaker's definition of this concept in § 4 of the License Tax Act.

"Defendant Municipality makes a great effort to show otherwise. If the purpose were, as in the case of the Sugar Act of the United States or in our Internal Revenue Law, to tax plaintiff based on the volume of its industrial production, the tax would be on each hundredweight of sugar processed or on each gallon of molasses produced and the Municipality would be right. But the concept of 'volume of business' contained in the Municipal License Tax Act does not contemplate, in the case of this industry, the total volume of industrial production, except where,

if it were possible under the present sugar legislation, the central has ground solely and exclusively its own cane.

"Section 2 of the Act, in establishing the groups of businesses and activities covered thereunder, includes in Group C the businesses of sugar and molasses mills. That was merely the manner of expressing that the sugar industry was among the businesses and activities covered thereunder. In the light of §§ 3 and 4 which follow, what is said in § 2 does not imply that the tax is levied on the basis of each unit of sugar or of molasses processed, since the Act itself, as recognized by our Supreme Court in *Cervecería India* v. *Municipality of Mayagüez*, 77 P.R.R. 91, decided August 9, 1954, provides that the tax is levied on the gross receipts of the industry, as the *volume of business* is defined.

"Plaintiff's gross receipts was the compensation received in accordance with the tariff for the grinding service which it rendered to the colonos, which compensation in dollars and cents amounted to $1,598,389.31. No one would think that plaintiff would be bound to pay income tax on the basis of gross receipts which should also include the colonos' receipts. Possibly the Municipality thought it would find support for its petition on the fact that § 4 of the License Tax Act, in defining the volume of business of banks, includes the amount of loans transacted. The lawmaker may have so provided, and this may be explained by the nature itself of banking transactions. But we already said that plaintiff, as a service entity, comes rather under the provisions of § 4 regarding this type of enterprises."

Judgment was rendered considering as volume of business of the central, for license tax purposes, only its share of the sugar and molasses produced. That judgment was challenged before this Court alleging that it was error to maintain that the volume of business of the central was not the total value of what it produced as a result of the grinding, but the share corresponding to the enterprise. This Court, by judgment of June 30, 1958, affirmed the ruling.[2]

---

[2] The judgment of this Court was as follows: "The record having been examined and the questions raised by the parties in their briefs having been studied, this Court is of the opinion that there is no merit in the three errors assigned by appellant in these appeals, and that, for the

■ On the other hand, appellee Association is not entirely a service entity. It is a commercial organization like any other mentioned in the License Tax Act. But within its operation there are certain special phases. It must be admitted that in a particular type of activity it is sometimes difficult for the municipal authority to apply correctly the concept of "volume of business," especially where the statute is of no help as in the case of banks and other transactions. Yet, this Court has announced certain criteria which may be used as a guidepost and which do not consider as volume of business and gross receipts every product or value handled by the taxpayers, but has preserved the usual and common term of the "income," namely, the gross receipts which increase the assets of an individual or enterprise.

■ Considering this case in the light of the criteria established by the Court as to the concept of volume of business defined in terms of gross receipts obtained, in the light of its operations, and of all the other circumstances, it must be concluded that the gross income of appellee Association consists of all amounts which it may receive as its own, for any account, including 25 percent of the total amount wagered on mutuels after deducting the bets on the winning horses, and 30 percent of the gross receipts wagered in daily double and pool.

■ For the purpose of levying the license tax, the amounts wagered on mutuels which are returned to bettors under certain circumstances, pursuant to the regulatory provisions *supra* (see n. 1), and amounts distributed among winners of mutuel bets, and amounts wagered on daily

reasons set forth in the opinion rendered by the trial court in these cases, the judgments appealed from rendered by the Superior Court, San Juan Part, on September 13, 1955, shall be and are hereby affirmed." Since this Court accepted not only the ruling but also the grounds thereof, the decision has been copied in part because of the orientation it may afford in this type of disputes.

doubles and pools which are distributed among the winning bettors and indirectly returned to the public in the form of prizes, cannot be considered as volume of business and gross income of appellee Association. As a question of fact and of law in the light of the Racing Act and its regulations, the sums so returned or distributed among the public have never been the property of appellee. They have always belonged to the bettors who raise such funds to be later distributed among the winners. See the norm laid down in *Fernández* v. *Las Monjas Racing Corp.*, 52 P.R.R. 761, 764 (1938), describing the trust nature of the wager fund.

■ Regarding the question under consideration, appellee merely offers or contributes through its enterprise, under strict government intervention, the service of its employees, agents, its equipment and properties, and the necessary and adequate physical facilities in order for the bettors to make their wager contracts, raise a common fund, and distribute it among them. In this sense, the appellee is very similar to *Zerbe* and *Toa.*

■ ■ The entire 30 percent of the total gross amount wagered on daily double and pool constitutes the gross receipts of appellee Association. The five percent which according to the Act is covered into the general fund of the Treasury partakes of the nature of a fee or license tax. To consider it otherwise would amount to saying that the Government is engaged in the operation of horse racing as a manager and minority partner of the appellee. This does not seem to have been the legislative intent. Because it is from gross receipts, no amount paid by the Association to the horse owners or to the jockeys by way of prizes or for any other account, or to its agents as commission or expenses, as direct or indirect taxes and disbursements, should be deducted. Briefly, appellee should pay tax to the Municipality on any amount or gross receipts which may be covered into

its treasury, excepting those sums strictly deposited with it by the bettors and which are returned to the latter or distributed among them in pursuance of law.

The sphere of taxation having been established, let us consider the second aspect of the case which turns on the first error assigned respecting the trial court's determination that appellant may pay tax on the basis of the volume of business in Carolina only and not on the volume of business of the Association within the entire Island of Puerto Rico. As a consequence it ruled that appellant could pay tax on a volume of business of less than $3,252,090.87 as compared with $7,357,457.65. Notwithstanding the error assigned, in its brief appellant seems to acquiesce in the trial court's determination in stating:

"According to Act No. 93 of June 25, 1962, effective July 1, 1962, amending § 1 of the Municipal License Tax Act, the Municipality of Carolina may levy the municipal tax on all transactions carried out by San Juan Racing Association within the territorial limits of the Municipality of Carolina, but it may not include within such gross receipts the income received from businesses transacted in offices or branches which the San Juan Racing may have in other municipalities of the Island.

"We therefore agree with the trial court that any income from business transacted by San Juan Racing in the municipalities of the Island rather than Carolina, if any, must be deducted from the total volume of business transacted by it."

The foregoing may contain a correct statement of the Act, but it does not necessarily imply that the trial court's determination on this point is correct. It is still necessary to determine the situs where appellee Association carries on its business.

Excluding all the receipts which must necessarily be produced at the premises of appellee's racetrack, within the political demarcation of appellant Municipality, as well as the mutuel wagers which can only be made at the racetrack, § 186–650 of the Regulation, this aspect of the problem con-

cerns mostly, if not entirely, the daily double and pool bets which according to the Regulation may be placed anywhere in Puerto Rico through the agents, §§ 186–605, 701.

Section 186–602 of the Regulation provides that the Association shall designate horse-racing agents *to receive* pool and daily double bets, and that the designation shall be approved by the Administrator. The Association shall furnish to the agents all the material necessary for betting, § 186–603; and it is provided, § 186–604, that the Racing Board shall fix the commission to be received by the agents for bets made through them, which commission shall be a share of the total value of the combinations played in the agency. When the bet is made on the premises of the race-track, the Association is not entitled to receive any commission. The amounts that the Association charges the agents for the material and use of the equipment for the bets shall be submitted to the Administrator, and at the request of the latter or of an interested party the Board may revise them, § 186–609. The Association may require the agents to post a bond, § 186–610. Section 186–628 makes it the agent's duty to account for all multiple and single combination pool tickets delivered to him, including those which are spoiled and which shall be marked "void" and returned. The Association shall keep a record of all "void" and nonreturned forms, and a copy thereof shall be delivered to the stewards before the running of the first race valid in the pool. All forms played must be registered and check sheets prepared, § 186–629. Upon the closing of the pool, all multiple and single combination pool tickets shall be placed in a steel case locked with two patented locks, and the same may not be opened until the determination is made, § 186–630. According to § 186–631, any multiple or single combination pool ticket appearing unreturned according to the check sheet shall not be deemed valid for determining the pool, nor may it share in the distribution of the pool.

■ Lastly, § 186–611 *supra*, which constitutes the most important provisions in the consideration of the problem involved, provides that a pool is a system of betting consisting in selecting the greatest number of winning horses, *and which appear* in the *single combination pool tickets and multiple combination pool tickets duly received, stamped,* and *registered* by the Association; and § 186–632 that no multiple or single combination ticket shall be valid, nor will it confer any action or right whatsoever against the Association until and unless the same *be delivered and registered* in the pool, but that it shall be liable for the prizes unless it shall have notified the stewards before the running of the first race valid for the pool with a record of the "void" forms and the forms unreturned by the agents. The Regulation contains similar provisions in connection with the daily double wagers, §§ 186–704, 709. *Cf. Díaz* v. *El Comandante Racetrack,* 87 P.R.R. 771 (1963).

■ From the above regulatory provisions, which have the force of law, it appears that the determination of the place where appellee carries on business is, in the last instance, a question of law. As a question of law, no pool and daily double bet placed in an agency creates a valid contract among the bettors until the wager contained in a combination is received, accepted, and registered *on the premises* of the race track, at the place therein designated by the Administrator. Once the bet placed by a bettor is timely received and registered and recorded in a check sheet, the betting contract is formalized and the bettor is entitled to receive the corresponding amount of the pool or of the daily double if his selection is a winning one. Even though, as a matter of fact, the agent may receive the bet anywhere on the Island, outside the political demarcation of the Municipality of Carolina, as a question of law there is no demandable valid betting contract until the bet is received, accepted, and registered within the demarcation of that Municipality.

Every bet on pools and daily doubles transacted by appellee Association takes place by law in the Municipality of Carolina, and should pay tax to this Municipality on the total amount of whatever amount may correspond to such transactions.

Insofar as the trial court's ruling did not include in the tax the amounts bet on pools and daily doubles returned or distributed among the bettors, the same is correct. Insofar as it held in law that appellee carries on business outside the Municipality of Carolina for the purposes of the license tax, is not correct. In view of the fact that this case was submitted on the stipulation copied, without our being able to determine with certainty whether the amounts agreed in the stipulation respond to the tax norms herein laid down, it seems advisable to set aside the judgment and to remand the case to the trial court, as in *Zerbe*, for computation of the tax to be paid in pursuance of the pronouncements herein made and for rendition of judgment fixing the exact amounts to be refunded.

Judgment will be rendered in compliance with the foregoing.

